UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| DEBORAH WOLFE, | ) |
|         Plaintiff, | ) |
| v. | ) No. 1:13 CV 102 JCH / DDN |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
|         Defendant. | ) |

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Deborah Wolfe for disability insurance benefits under Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be affirmed.

**I. BACKGROUND**

Plaintiff Deborah Wolfe, born July 9, 1953, applied for Title XVI benefits on June 29, 2010. (Tr. 173-76.) She alleged an onset date of disability of January 1, 2000, due to diabetes, high blood pressure, glaucoma, arthritis, low energy, and stress. (Tr. 239.) Plaintiff's application was denied initially on September 16, 2010, and she requested a hearing before an ALJ. (Tr. 78-85.)

On June 25, 2012, following a hearing, the ALJ found plaintiff not disabled. (Tr. 14-22.) On May 14, 2013, the Appeals Council denied plaintiff's request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

## II. MEDICAL HISTORY

On March 10, 1999, plaintiff complained of intraocular pressure. Her visual acuity with refractive correction measured 20/20 in both eyes, and Richard Kies, M.D., noted no retinopathy in her periphery.[2] He also found her type 2 diabetes and ocular hypertension stable.[3] He prescribed Ocupress.[4] (Tr. 340.)

On September 1, 1999, plaintiff complained of periodic intraocular eye pressure. Dr. Kies recommended that plaintiff continue using eye drops. His impression was ocular hypertension and type 2 diabetes. (Tr. 338-39.)

On September 14, 1999, plaintiff complained of periodic intraocular pressure. Plaintiff's visual acuity measured 20/20 in her right eye and 20/25 in her left eye. Dr. Kies' impression was ocular hypertension. (Tr. 341.)

On March 1, 2000, plaintiff complained of an increased number of floaters and grittiness in both eyes that began two months earlier. Dr. Kies' impression was ocular hypertension, myopia, blepharochalasis, and vitreous floaters. He discussed retinal detachment, referred her for a retinal evaluation, and recommended disc photographs. (Tr. 342.)

On April 20, 2000 plaintiff visited Retina & Vitreous Consultants on Dr. Kies's referral. She complained of vitreous floaters that began two years earlier with increased frequency during the past six months. Her medications included Glucophage, Amaryl, and Premarin.[5] (Tr. 322.)

On October 2, 2000, plaintiff reported that she had not taken medication for two weeks and inquired regarding an oral hypoglycemic medication. Nova Crawford, N.P., assessed type 2 diabetes and excessive daytime sleepiness. Plaintiff's blood sugar remained constant with or

---

[2] Retinopathy is a noninflammatory degenerative disease of the retina. Stedman's Medical Dictionary, 1394 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[3] Type 2 diabetes is a condition characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently. Id. at 530.

[4] Ocupress is a brand name for carteolol, used to treat high pressure inside the eye due to open-angle type glaucoma or other eye diseases such as ocular hypertension. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

[5] Glucophage, a brand name for Metformin, is used to control high blood sugar in patients with type 2 diabetes. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Amaryl, a brand name for Glimepiride, is used to control high blood sugar in people with type 2 diabetes. Id. Premarin is a female hormone used to help reduce symptoms of menopause. Id.

without medication, and she did not follow a diabetic diet. NP Crawford prescribed Glucovance and Actos and recommended blood and liver tests.[6] (Tr. 311.)

On October 23, 2000, plaintiff complained of back pain that began one day earlier and that she had a history of back pain. James E. Palen, M.D., found that plaintiff's blood sugar had decreased. Dr. Palen indicated concern with high blood sugar levels and instructed plaintiff to monitor her blood sugar readings. (Tr. 310.)

On October 26, 2000, plaintiff complained that her vision impaired her ability to drive at night and read in close proximity. (Tr. 323.)

On November 20, 2000, plaintiff reported high blood sugar levels and complained of tingling in her feet that began two to three months earlier and focused on her left foot and left big toe. (Tr. 310.)

On November 29, 2000, Dr. Palen prescribed Avandia.[7] (Tr. 312.)

On March 1, 2001, plaintiff had no complaints regarding type 2 diabetes or excessive daytime sleepiness. Dr. Palen scheduled a mammogram. (Tr. 309-10.)

On April 26, 2001, plaintiff reported that her vision continued to impair her ability to drive at night. She further complained of occasionally seeing floaters and grittiness. (Tr. 323.)

On May 31, 2001, plaintiff reported financial hardship and lack of medical insurance coverage. Dr. Palen assessed type 2 diabetes and excessive daytime sleepiness. He instructed her to take all medication as prescribed and resolved any confusion regarding medication dosages and schedule. (Tr. 309.)

On August 31, 2001, a comprehensive review of systems found no changes in plaintiff's health. (Tr. 308-09.)

On September 28, 2001, plaintiff reported that she forgot to obtain her scheduled blood tests and that she could not afford the prescribed dosage of Avandia. Plaintiff weighed 254

---

[6] Glucovance is a combination medication used to control high blood sugar in people with type 2 diabetes. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Actos is a brand name for pioglitazone, an anti-diabetic drug used to control high blood sugar in patients with type 2 diabetes. Id.

[7] Avandia is a brand name for rosiglitazone, an anti-diabetic drug used to control high blood sugar in people with type 2 diabetes. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

pounds, which Dr. Palen described as obese. He also provided plaintiff with information on managing diabetes with exercise and dieting. (Tr. 308.)

On November 5, 2001, plaintiff complained of discomfort and reported that she could read only for short periods. Dr. Kies found 20/20 visual acuity with refractive correction but also noted retinal asymmetry in the right eye. He assessed her glaucoma was within normal limits and directed plaintiff to continue use of Ocupress. (Tr. 332-33, 343.)

On December 6, 2001, plaintiff complained of continued high blood sugar and a gum infection which she had been treating with soda, peroxide, and salt water to no avail. Dr. Palen assessed type 2 diabetes mellitus and obesity. (Tr. 307-08.)

On February 25, 2002, plaintiff reported that she had been without Glucovance and Avandia for two weeks. Plaintiff reported high blood sugar levels despite the increased dosage of Glucovance. Dr. Palen assessed type 2 diabetes mellitus and obesity. (Tr. 307.)

On March 1, 2002, plaintiff complained of grittiness in both eyes. Dr. Kies assessed ocular hypertension and type 2 diabetes and prescribed Xalatan and carteolol hydrochloride.[8] (Tr. 344.)

On April 17, 2002, plaintiff complained of pain in her right chest and rib region, which began when she stood up after affixing a hose to her clothes dryer. She stated she had not slept for the prior two nights and experienced difficulty breathing due to the pain. Dr. Palen assessed type 2 diabetes and right flank pain and ordered an ultrasound and spine X-ray. (Tr. 307.)

On April 18, 2002, plaintiff complained of continued right side pain. Dr. Palen prescribed Ultracet to manage the pain.[9] (Tr. 306, 321)

On March 3, 2003, plaintiff indicated concern regarding her blood sugar and complained of a right leg sore that appeared two weeks earlier but had not healed. Plaintiff further reported

---

[8] Xalatan, a brand name for Latanoprost, is used to treat high pressure inside the eye caused by glaucoma or other eye diseases such as ocular hypertension. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Carteolol hydrochloride is used to treat high pressure inside the eye due to open-angle type glaucoma or other eye diseases such as ocular hypertension. Id.

[9] Ultracet is used to treat moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

that she discontinued Premarin but started Tao.[10]  Dr. Palen assessed excessive daytime sleepiness and type 2 diabetes and recommended a bone density test.  (Tr. 305.)

On March 17, 2003, plaintiff reported that her leg had healed and that she had been walking and attempting to reduce food portions.  Dr. Palen assessed type 2 diabetes and obesity.  (Tr. 305.)

On July 28, 2003, plaintiff complained of stress caused by her father's hospitalization for cancer.  Dr. Palen assessed type 2 diabetes and scheduled a cyst removal.  (Tr. 304.)

On November 25, 2003, plaintiff complained of bilateral earaches, a sore throat, chest pain, coughing up phlegm, and shortness of breath.  Dr. Palen assessed an upper respiratory infection and type 2 diabetes, and prescribed Biaxin XL and Clarinex.[11]  (Tr. 304.)

On March 20, 2006, plaintiff met with Georgia Gremillion, APRN, BC, FNP, at Crosstrails Medical Center.  Plaintiff complained of type 2 diabetes, excessive urination, and foot neuropathy.  Nurse Practitioner (NP) Gremillion's impression was uncontrolled type 2 diabetes and obesity.  She received prescriptions for metformin and Altace.[12]  (Tr. 553-54.)

On May 4, 2006, plaintiff complained of high blood sugar levels. NP Gremillion assessed uncontrolled type 2 diabetes and morbid obesity and increased plaintiff's Glucophage dosage.  (Tr. 551-52.)

On May 25, 2006, NP Gremillion performed a routine checkup, assessing uncontrolled type 2 diabetes, obesity, and increased lipids.  (Tr. 549-50.)

On June 13, 2006, plaintiff complained of a urinary tract infection, constipation, low back pain, and dysuria but reported noncompliance with diet.  The impression of NP Gremillion was type 2 diabetes, hypertension, dyslipidemia, morbid obesity, and urinary tract infection.  She prescribed Levaquin and increased the dosage of Actos.  (Tr. 547-48.)

---

[10] Tao is used to treat upper respiratory tract infections caused by streptococcus and pneumonia caused by pneumococcus bacteria.  WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

[11] Biaxin XL is brand name for clarithromycin, an antibiotic used to treat a wide variety of bacterial respiratory tract infections.  WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).  Clarinex is a brand name for desloratadine, an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes/nose, sneezing, hives, and itching.  Id.

[12] Altace is a brand name for Ramipril, used to treat high blood pressure.  WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

On July 13, 2006, NP Gremillion performed a routine checkup, assessing uncontrolled type 2 diabetes, morbid obesity, and increased lipids. (Tr. 545-46.)

On May 16, 2007, plaintiff met with Dennis Long, FNP, to request a new medical provider. Plaintiff reported chronic neck pain. NP Long assessed type 2 diabetes, hyperlipidemia, glaucoma, and neck muscle spasms and prescribed Actos, Lovastatin, Metformin, and Flexeril.[13] (Tr. 360-61.)

On October 16, 2007, plaintiff complained of occasional eye grittiness and reported that she generally only wore reading glasses to assist her vision. Dr. Kies found her unassisted visual acuity to be 20/20. His impression was ocular hypertension and background diabetic retinopathy. He continued her on Xalatan, discontinued corteolol, and recommended that she control her blood sugar levels. (Tr. 345.)

On November 19, 2007, plaintiff denied any change in her visual acuity over the prior month. Dr. Kies assessed plaintiff's ocular health as stable, noted her type 2 diabetes, and instructed her to keep her blood sugar under control. (Tr. 346.)

On January 2, 2008, plaintiff complained of elevated blood pressure resulting from her ingestion of several Advil cold medication pills. NP Long assessed sinusitis and hypertension. He instructed plaintiff to cease her use of the cold medication and prescribed Amoxil.[14] (Tr. 358-59.)

On February 25, 2008, plaintiff complained of film that began two to three weeks earlier and a burst blood vessel in her left eye. She further complained of uncontrolled blood sugar levels and occasional pain in both eyes. Dr. Kies' impression was decreased left eye visual acuity, ocular hypertension, and left eye background diabetic retinopathy. He recommended a retinal evaluation. (Tr. 347.)

On March 1, 2008, plaintiff complained of some possible bleeding behind her left eye as well as recurring floaters and film. (Tr. 324.)

---

[13] Lovastatin is used to lower "bad" cholesterol and fats such as LDL and triglycerides and raise "good" cholesterol, HDL, in the blood. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Flexeril, a brand name for cyclobenzaprine, is used as short-term treatment of muscle spasms. Id.

[14] Amoxil is a penicillin-type antibiotic used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

On March 27, 2008, plaintiff underwent a laser procedure on her left eye. On the same day, plaintiff reported dissatisfaction with her diet and requested blood work. Lisa Kail, FNP, recommended liver function tests, but plaintiff rejected other lab tests due to lack of insurance coverage. Kail observed plaintiff's cracked heels and assessed diabetes and hypertension. She also described plaintiff's diet as uncontrolled. (Tr. 324, 356-57.)

On July 15, 2008, NP Kail noted that plaintiff complained of joint pain, stiffness, arthritis, and backaches. Kail also noted plaintiff suffered from hypertension. (Tr. 354-55.)

On September 16, 2008, plaintiff complained of cough and sputum. X-rays revealed left ventricular enlargement with no acute infiltrates or congestive heart failure. NP Long's impression was bronchitis and sinusitis and prescribed lincocin, albuterol, Zithromax, and Pro-air.[15] (Tr. 352-53, 366.)

On October 3, 2008, thoracic spine X-rays revealed normal alignment and no fractures or dislocations. Additionally, chest X-rays revealed no evidence of acute fractures or dislocation. (Tr. 348-49.)

On January 1, 2009, plaintiff followed up on her complaints of hypertension, hyperlipidemia, neck pain, type 2 diabetes, and sinus issues. NP Long prescribed Amoxil. (Tr. 444-45.)

On January 21, 2009, X-rays of the cervical and lumbar spine revealed moderate degenerative disc disease at C5-C6, mild degenerative disc disease at L5-S1, and multilevel facet hypertrophic changes in the lumbar spine.[16] Knee X-rays revealed mild degenerative change involving the left patellofemoral joint but no fracture or bone destructive process. (Tr. 558-61.)

---

[15] Lincocin is used to treat infections caused by the bacteria streptococcus, staphylococcus, and streptococcus pneumoniae. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Albuterol is used to prevent and treat wheezing and shortness of breath caused by breathing problems such as asthma and chronic obstructive pulmonary disease. Id. Zithromax is a brand name for azithromycin, used to prevent and treat a very serious type of infections, mycobacteria. Id. Pro-air is a brand name for albuterol. Id.

[16] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1–C7), twelve thoracic vertebrae (denoted T1–T12), five lumbar vertebrae (denoted L1–L5), five sacral vertebrae (denoted S1–S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the low back. The sacrum is immediately below the lumbar vertebrae. Stedman at 226, 831, 1376, 1549, 1710, Plate 2.

On January 22, 2009, Thomas K. Krummenacher, M.D., wrote to Dr. Kies informing him of the successful laser procedure performed on plaintiff's left eye. Dr. Krummenacher advised plaintiff to continue controlling her blood sugar levels and to continue on Xalatan. (Tr. 374-75.)

On February 9, 2009, plaintiff followed up on her complaint of type 2 diabetes, hypertension, and hyperlipidemia. NP Long ordered labs. (Tr. 442-43.)

On December 7, 2009, plaintiff complained of a fast heart rate, type 2 diabetes, a facial sore, and sinus pressure. NP Long described plaintiff's diabetes as uncontrolled. He assessed paroxysmal atrial tachycardia, uncontrolled type 2 diabetes, impetigo, and sinusitis and prescribed atenolol, Keflex, Diflucan, and Actos.[17] (Tr. 438-39.)

On March 10, 2010, plaintiff complained of sinus drainage and chronic neck pain. NP Long assessed type 2 diabetes, sinusitis, and neck pain and prescribed Actos, Bactrim, and Darvocet.[18] (Tr. 436-37.)

On June 21, 2010, plaintiff arrived at the emergency room, complaining of chest discomfort. William K. LaFoe, M.D., admitted her for an overnight stay. Chest X-rays revealed a prominent heart size but no acute cardiopulmonary disease. Dr. LaFoe performed a coronary angiogram and left ventriculogram, which revealed normal coronaries and left ventricle. He described the pain as non-cardiac. Plaintiff complained of inability to pay for the recommended blood sugar testing and endocrinology consultation. She reported that she could walk around Wal-Mart but that it caused pain. Ahmad Zaki Sheikh, M.D., assessed type 2 diabetes, palpable thyroid nodules, angina, hypertriglyceridemia, hypertension, obesity, and diabetic neuropathy. He prescribed Lantus and Humalog.[19] On June 23, 2010, Dr. LaFoe discharged plaintiff. He

---

[17] Keflex is a medication used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Diflucan, a brand name for fluconazole, used to prevent and treat a variety of fungal and yeast infections. Id.

[18] Bactrim is a combination of two antibiotics used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Darvocet is a narcotic pain reliever that is no longer available in the United States. RxList, http://www.rxlist.com/darvocet-n-drug/patient-images-side-effects.htm (last visited May 27, 2014).

[19] Lantus, a brand name for insulin glargine, is used to control high blood sugar in people with type 1 or type 2 diabetes. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Humalog, a brand name for insulin lispro, is used to control high blood sugar in people with diabetes. Id.

diagnosed unstable angina, morbid obesity, insulin dependent diabetes, hypertension, asymptomatic gallstones, and hyperlipidemia. He prescribed TriCor, baby aspirin, citalopram, Flexeril, lisinopril, and metformin.[20] (Tr. 376-403.)

On July 21, 2010, plaintiff complained of an achy right eye, decreased visual acuity, and difficulty reading. Dr. Kies diagnosed stable ocular hypertension and early onset nuclear sclerosis. (Tr. 456.)

On September 14, 2010, Gretchen Brandhorst, Psy.D., performed a psychiatric review on plaintiff. She found that plaintiff suffered from depression but that plaintiff had no severe impairments. (Tr. 464-74.)

On September 16, 2010, Mel Moore, M.D., performed a Physical Residual Function Capacity Assessment on plaintiff. He found that plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, could stand and walk about six hours during an eight-hour workday, sit for about six hours, and had no restrictions with the ability to push and pull. Additionally, he limited plaintiff to sitting about six hours in an eight-hour workday; the same limitation was placed on her ability to walk or stand. (Tr. 475-80.)

On February 4, 2011, plaintiff complained of bloody stools and fatigue. NP Long assessed type 2 diabetes, hematochezia, dysuria, low back pain, sinusitis, and fatigue. He referred her for a colonoscopy and to endocrinology and prescribed hydrocodone and Zithromax.[21] (Tr. 539-40.)

On February 14, 2011, plaintiff complained of constipation, diarrhea, blood in her stool, epigastric pain with rare heartburn, weight loss, and food and drink getting lodged in her esophagus. Michele Tanz, FNP, diagnosed plaintiff as having altered bowel habits,

---

[20] TriCor, a brand name for fenofibrate, is used to lower "bad" cholesterol and fats such as LDL and triglycerides and raise "good" cholesterol, HDL, in the blood. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Citalopram is used to treat depression. Id. Lisinopril is used to treat high blood pressure. Id.

[21] Hydrocodone is a narcotic used to relieve moderate to severe ongoing pain. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

hematochezia, melena, epigastric pain, dysphagia, and weight loss.[22] NP Tanz recommended Moviprep, magnesium citrate, and Miralax. (Tr. 529.)

On March 23, 2011, plaintiff complained of wheezing, nasal drainage, coughing, and a headache. NP Long diagnosed plaintiff with allergic rhinitis, sinusitis, and diabetic neuropathy.[23] NP Long prescribed Zithromax, Gabapentin, Loratadine, and Flonase.[24] (Tr. 537-38.)

On April 6, 2011, Pamela Klosterman, APRN, FNP-BC, CDE, wrote to NP Long, informing him of plaintiff's initial evaluation. NP Klosterman assessed uncontrolled type 2 diabetes, hypertension, hyperlipidemia, neuropathy, obesity, and fatigue. (Tr. 601-02.)

On July 27, 2011, plaintiff complained of chronic left shoulder pain, left kidney pain, lumbar pain, and diabetes. NP Long observed a decreased range of motion in the left shoulder and left para-lumbar spine. He assessed diabetes mellitus and pain at several sites, recommended X-rays, and prescribed tramadol.[25] (Tr. 595-96.)

On July 29, 2011, left shoulder X-rays revealed degenerative changes at C4-5 and C5-6 but no acute findings. Lumbar X-rays revealed degenerative disc disease at L4-5 and L5-S1 but there were no acute findings. (Tr. 483-84.)

On August 8, 2011, plaintiff complained of neck and left shoulder pain, stating the shoulder pain had been present for several months and the neck pain for several years. NP Long ordered MRIs scans for the neck and left shoulder. (Tr. 593-94.)

On January 6, 2012, plaintiff complained of a sinus infection and right ear pain. Daniel Dansby, FNP, assessed depression, allergies, hearing loss, type 2 diabetes, and hypertension. As

---

[22] Hematochezia is the passage of bloody stools. Stedman at 862. Melena is the passage of dark-colored, tarry stools, due to the presence of blood altered by intestinal juices. Id. at 1176. Dysphagia is difficulty swallowing. Id. at 599.

[23] Allergic rhinitis is inflammation of the nasal mucous membrane associated with hay fever. Stedman at 1690.

[24] Gabapentin is used with other medications to prevent and control seizures as well as to relieve nerve pain. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Loratadine is used to treat symptoms such as itching, runny nose, watery eyes, and sneezing from hay fever and other allergies. Id.

[25] Tramadol is used to help relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

a result, he referred plaintiff to an ENT physician and prescribed Celexa, Ambien, and Zyrtec.[26] (Tr. 589-90.)

On February 28, 2012, plaintiff complained of collarbone pain that began two weeks earlier and pain in her abdomen over the previous week. NP Dansby assessed depression, multisite pain, and type 2 diabetes. He prescribed Bactrim and Lorcet and ordered a right shoulder X-ray.[27] (Tr. 583-84.)

On March 6, 2012, NP Dansby completed a medical source statement for plaintiff's mental limitations. He found that plaintiff's ability to remember locations and work-like procedures, ability understand a recall very short and simple instructions, and ability to understand and remember detailed instructions were all moderately limited. Additionally, he assessed plaintiff as moderately limited in her mental capacity to perform very short and simple instructions, perform detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work related decisions, complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 568-69.)

NP Dansby also completed a form regarding diabetes and physical condition. He diagnosed brittle diabetes, neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station, coronary artery disease, and nephropathy.[28] He found that plaintiff was unable to work, could stand for only fifteen minutes continuously, could sit for only

---

[26] Celexa is an antidepressant used to treat a variety of conditions, including depression and other mental and mood disorders. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

[27] Lorcet is a medication used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014).

[28] Brittle diabetes is mellitus in which there are marked fluctuations in blood glucose concentrations that are difficult to control. Stedman at 528. Nephropathy is any disease of the kidney. Id. at 1291.

fifteen minutes continuously, could occasionally lift five pounds, could lift no weight frequently, and could balance occasionally. Additionally, he found that plaintiff could stand and walk less than one hour per eight-hour workday and sit for only one hour. He further described plaintiff's ability to push and pull as limited due to decreased strength in her upper extremities. He found that she could never climb, kneel, crouch, crawl, and could only occasionally balance, stoop, reach, and handle. He also found that she should avoid any exposure to extreme heat or cold, weather, dust and fumes, vibrations, hazards, or heights and moderate exposure to wetness and humidity. Additionally, Dansby stated plaintiff's use of Lorcet impaired her concentration, persistence, or pace. (Tr. 563, 565-66.)

On March 26, 2012, Kayce Strohmeyer, O.D, examined plaintiff for ocular issues relating to diabetes. Dr. Strohmeyer diagnosed dry eye and glaucoma and continued Xalatan. (Tr. 605-12.)

On April 3, 2012, plaintiff reported shortness of breath, headaches, and glaucoma and weighed 194 pounds. P. Klosterman, APRN, assessed type 2 diabetes, hypertension, and obesity and prescribed metformin, glyburide, Byetta, Lantus, and lisinopril.[29] (Tr. 580-81.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on May 15, 2012. (Tr. 28-65.) Plaintiff testified the following. She lives alone. She measures five feet, one inch, and 191 pounds. She drove to the hearing. (Tr. 39, 53.)

Plaintiff received her high school diploma and did not attend any vocational, technical, or trade schools. She previously worked as an industrial sewing machine operator for 13 years until her employer closed the factory in 1995. She last worked in 2010 for two months as a part-time caregiver, where her duties included feeding, bathing, and cleaning. She last worked full-time as a caregiver until her employer's death in 1999, and her alleged disability date was January 1, 2000. Her son has helped her financially. She cannot provide care for work due to her inability to lift people, climb stairs, or perform housework, including vacuuming. (Tr. 40, 46-48.)

---

[29] Glyburide is used to control high blood sugar in people with type 2 diabetes. WebMD, http://www.webmd.com/drugs (last visited May 27, 2014). Byetta, a brand name for Exenatide, is used to control high blood sugar in people with type 2 diabetes. Id. Lantus, a brand name for Insulin Glargine, used to control high blood sugar in people with either type 1 or 2 diabetes. Id.

Plaintiff has been diagnosed with diabetes but did not learn the extent of her ailment until after her alleged disability date. She has recently received consistent medical care but due to lack of insurance and funds, did not previously receive such care or take all of the medication prescribed to her. Daniel Dansbury treats the pain in her back and legs, and she also sees a diabetes specialist, Pam Klosterman. Plaintiff currently manages her diabetes with metformin, glyburide, Byetta, and Lantus, which has improved her condition. She has received instructions regarding her diet due to diabetes but has not visited a nutritionist or dietician. She manages her high blood pressure with lisinopril, neuropathy with gabapentin, and her low back and leg pain with ibuprofen. (Tr. 40-43.)

She last went to a hospital in 2010 when she suspected a heart attack due to chest pains, but physicians could not link the symptoms to a heart-related cause. Rather, the stress she felt due to the loss of her father caused the chest pain. She continues to experience stress due to her mother's health and hospitalization. Stress and diabetes caused her to lose sixty pounds. When she wakes up, she does not feel refreshed. She also has depression. (Tr. 43, 52-53.)

She has experienced pain in her back and shoulder. X-rays revealed spurs in the left arm, which she cannot fully lift. Occasionally, she cannot turn her head due to neck pain. (Tr. 51.)

On a typical day, plaintiff awakens at 7:30 or 8:00 a.m. She visits her mother at the hospital. She can perform most household chores but cannot clean her cabinet due to the back and leg pain. Her son performs yard work for her. She can drive and can shop for groceries on her own. She spends most of her day reading and watching some television. She occasionally crochets but only in five-minute intervals due to hand pain. Occasionally she experiences pain while watching television. Plaintiff can lift only twelve to fifteen pounds, the weight of her one-year-old nephew. (Tr. 39, 44-45, 50-51, 54.)

Plaintiff has very painful neuropathy in her feet, ankles, and, recently, her legs. The pain significantly disrupts her sleep. Additionally, the pain prevents her from walking for more than ten to fifteen continuous minutes, and she often forgoes footwear. Standing causes back pain. Plaintiff will occasionally use a cane around her home to assist her balance. Her physician recommended diabetic shoes, but she has not yet received them. When plaintiff sits, she experiences constant tingling in her feet. She currently treats this condition with vitamins B and E and the prescription medication Celexa. (Tr. 42, 49-50, 55-56.)

Plaintiff also suffers from vision problems due to fluctuating pressure in her eyes caused by glaucoma. Her last optometrist visit revealed no issues, but the optometrist advised her to be aware of her eye pressure to avoid rupturing blood vessels. Previous blood vessel ruptures resulted in bleeding, which required laser surgery. (Tr. 50.)

Medical expert (ME) Jerry Seligman, M.D., also testified at the hearing. He reviewed the medical record. The medical record included diagnoses of thyroid nodules, hypertension, diabetes with neuropathy and retinopathy, depression, glaucoma, and disk disease. Plaintiff's condition did not meet or equal any Listing from June 2009 to the day of the hearing. She can sit seven of eight workday hours and stand or walk four of eight workday hours. She can lift or carry twenty-five to fifty pounds occasionally and eleven to twenty-five pounds frequently. She cannot push or pull with her hands and cannot perform repetitive motions with her feet. She can only occasionally bend, squat, crawl, climb, and reach. She can sit or stand for only one to two hours without changing positions. (Tr. 57-58.)

Vocational expert (VE) John Grenfell also testified at the hearing. Plaintiff's past work included work as a home attendant, which is medium work, and sewing machine operator, which is light work. The skills required by home attendant work did not transfer to lighter than medium work. (Tr. 60.)

The ALJ presented to the VE a hypothetical question concerning an individual with plaintiff's age, education, and work experience. The individual can sit at least seven out of eight hours, could stand and walk for four of eight hours, continuously stand and walk for only one to two hours, occasionally lift and carry twenty-five to fifty pounds, frequently lift and carry eleven to twenty-five pounds, occasionally bend, stoop, kneel, crouch, crawl, and climb ramps and stairs, and never climb scaffolds, ropes, or ladders. Additionally, the individual must avoid forceful pushing and pulling with the arms, repetitive use of foot controls, and working near heights or dangerous machinery without protection. The VE responded that such an individual could perform as a home attendant. (Tr. 60-61.)

The ALJ altered the hypothetical individual with the requirement that the individual could not lift above shoulder level with the left arm. The VE responded that such an individual would still be capable of performing the job of a home attendant. (Tr. 62.)

In response to questioning by plaintiff's counsel, the VE further testified that while the Occupational Outlook Handbook includes pushing and pulling requirements, the Dictionary of

Occupational Titles does not. The Occupational Outlook Handbook indicates the pushing and pulling requirements of a home attendant vary. If a person were restricted to never pushing and pulling, the individual could not perform that job. Lifting over twenty-five pounds constitutes medium work. The job typically requires assisting the individual receiving care with getting out of a chair or tub. (Tr. 62-63.)

### III. DECISION OF THE ALJ

On June 25, 2012, the ALJ issued a decision that plaintiff was not disabled. (Tr. 14.) At Step One of the prescribed regulatory scheme, the ALJ found she had not engaged in substantial gainful activity since January 1, 2000, the alleged onset date.[30] At Step Two the ALJ found that plaintiff had obesity, mild degenerative disc disease of the lumbosacral spine and cervical spine, mild degenerative changes of the left knee, diabetes mellitus, hypertension, hyperlipidemia, and possible mild peripheral neuropathy. (Tr. 21.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and found plaintiff had a residual functional capacity to perform the physical exertional and non-exertional requirements of work except for lifting and carrying more than twenty-five pounds frequently or more than fifty pounds occasionally; climbing ropes, ladders, or scaffolds; more than occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, or operating of foot controls; using the non-dominant left arm above shoulder level or forcefully pushing or pulling; or working near concentrated exposure to unprotected heights or dangerous moving machinery. At Step Four, the ALJ found that plaintiff could perform her past relevant work as a home attendant. (Tr. 21-22.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a

---

[30] See below for explanation.

reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred by (1) discounting and failing to consider the opinion of Dr. Seligman and (2) improperly determining her RFC.

### A. Dr. Seligman's Opinion

Plaintiff argues that the ALJ erred by failing to properly consider the opinion of Dr. Seligman in conjunction with the opinion of the state agency medical evaluator, Dr. Moore, in determining the extent of plaintiff's pushing and pulling limitations and ability to reach.

The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the source is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c). Further, an ALJ is not obligated to defer to a treating physician's medical opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in the record." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir.2008) (quoting Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir.2005)).

Plaintiff first argues that the ALJ incorrectly substituted Dr. Moore's medical evaluation for Dr. Seligman's restriction on plaintiff's alleged inability to use her hands for pushing and pulling. However, contrary to plaintiff's allegations, the ALJ did not substitute one opinion for another. Rather, he found Dr. Moore's evaluation more consistent with the record. The ALJ based this determination largely on the fact that no treating physician had ever placed any long-term limitations on plaintiff. (Tr. 20.)

The ALJ found the state agency medical evaluator more credible than Dr. Seligman. He made this determination by relying on numerous back and shoulder imaging studies which demonstrated mild disc degeneration and no acute findings. (Tr. 348-49, 483-84, 558-59.) In February 2012, NP Dansby prescribed pain medication and recommended a right shoulder X-ray but did not restrict plaintiff's activities. (Tr. 583.) Additionally, on plaintiff's function report, she did not indicate that her impairments affected her ability to use her hands. (Tr. 261.) Because the ALJ did not substitute the Dr. Moore's opinion for Dr. Seligman's opinion, but rather found the state agency opinion more consistent with the record, plaintiff's argument is without merit.

Plaintiff also argues that the ALJ failed to address Dr. Seligman's opinion limiting plaintiff to only occasionally reaching. Although ALJs must consider opinions in the record, the ALJ is not required to discuss every piece of evidence submitted. Wildman v. Astrue, 596 F.3d

959, 966 (8th Cir.2010). Although the ALJ did not discuss Dr. Seligman's opinion regarding plaintiff's ability to reach, the ALJ's discussion of other portions of Dr. Seligman's testimony implies that he considered it. (Tr. 19, 57-58.) Accordingly, plaintiff's argument is without merit.

**B. RFC Determination**

Plaintiff argues the ALJ failed to properly determine plaintiff's RFC by not explicitly relating specific medical evidence or testimony to his determination. Plaintiff claims the ALJ's determination did not discuss the medical evidence and that the record did not support it.

Plaintiff relies on Social Security Ruling 96–8p, which states that the ALJ must consider all allegations of physical and mental limitations and must make every reasonable effort to ensure that the record contains sufficient evidence to assess the RFC. Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96–8p (1996). This ruling also states that the RFC assessment must contain a narrative discussion of evidence supporting each conclusion with citations to specific medical facts and nonmedical evidence. Id. Plaintiff argues that the ALJ generally did not link either the physical or mental RFC determinations with any medical evidence.

The ALJ cited both medical and nonmedical records extensively as they related to plaintiff's claims of impairment. In discussing plaintiff's claim of glaucoma, the ALJ cited the March 2012 optometrist appointment, in which no negative indications were found outside of "dry eye," which required no medical treatment. (Tr. 18, 605-12.) Additionally, the record indicated plaintiff's consistent 20/20 visual acuity with only slight intermittent variances; plaintiff's numerous eye examinations support this. (See e.g. Tr. 323-25, 334-35, 340-47, 356-58, 371-72, 375.)

The ALJ also reviewed plaintiff's allegations of diabetes and high blood pressure. The record indicated plaintiff's well-controlled hyperlipidemia and blood pressure at normal levels. (Tr. 18-19, 580-81.) The ALJ noted that the record did not reflect persistent diastolic blood pressure above 100. (Id.) Despite consistently high blood glucose, NP Klosterman did not schedule another appointment until three months later, indicating a lack of urgency regarding the condition. (Tr. 580-81)

Additionally, the ALJ discussed and cited relevant medical records regarding plaintiff's allegations of arthritis and back pain. The ALJ discussed plaintiff's complaint of right flank and back pain on April 17, 2002, noting that the X-ray demonstrated mild osteopenia. (Tr. 16, 307.) The ALJ also detailed plaintiff's July 27, 2011 complaint of back pain. (Tr. 17.) The resulting lumbar spine X-ray demonstrated degenerative disc disease at L4-L5 and L5-S1 and the cervical spine X-ray showed degenerative disc disease at C4-C5 and C5-C6; there were no acute findings. (Tr. 483-84.) The ALJ also noted plaintiff's complaint of back and rib pain on October 3, 2008; thoracic spine X-rays were negative. (Tr. 16, 348-49.) After complaining of continued severe back pain on August 8, 2011, plaintiff did not follow up with a scheduled imaging; no further conclusion could be drawn from that visit. (Tr. 593-94.) Medical evidence revealing only minor impairments is a sufficient basis to discount a claimant's complaint of disabling pain. See Matthews v. Bowen, 879 F.2d 422, 425 (8th Cir. 1989).

The ALJ also noted the lack of evidence supporting plaintiff's claim of disabling stress and depression. (Tr. 20.) Specifically, he discounted NP Dansby's assessment of disability as related to plaintiff's mental capabilities due to the lack of medical evidence and history to support his diagnosis. (Tr. 20-21.) Additionally, the ALJ noted the lack of sustained mental health treatment received by plaintiff and the ALJ's own observation of the lack of obvious signs of depression, anxiety, memory loss, or other mental disturbance at the hearing to support his determination. (Tr. 21.) The ALJ may consider the failure by a claimant to pursue medical treatment in determining the credibility of the claim. See Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir.2003).

Accordingly, because the ALJ complied with SSR 96-8p by supporting the RFC determination with substantial evidence and provided a narrative discussion of the evidence in support, plaintiff's argument is without merit.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

    /s/ David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 20, 2014.